POWELL v. STEPHENSON.  (No. 49.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 26, 1916.)

1. EXECUTORS AND ADMINISTRATORS ⬤⟞56 — ASSETS—PROPERTY SOLD.

Where property is conveyed by a decedent during his lifetime, whether bona fide or in fraud of creditors, the title and possession having passed, such property forms no part of the estate, and the administrator is without authority to prosecute a suit for its recovery or to list it as the property of the estate.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 308; Dec. Dig. ⬤⟞56; Action, Cent. Dig. § 262.]

2. JUDGMENT ⬤⟞632—CONCLUSIVENESS—SUIT AGAINST ESTATE OF DECEDENT.

A judgment in favor of the estate of a decedent, in a suit by a creditor to establish his claim, is binding in an action by the creditor against a purchaser of the decedent to set aside a sale of personal property as in fraud of creditors.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1148; Dec. Dig. ⬤⟞632.]

3. SALES ⬤⟞148 — BILL OF SALE — NECESSITY OF RECORD—DELIVERY.

There being no intention on the part of a seller of cattle to sell or transfer his mark, where there was a bill of sale followed by actual delivery of possession upon the range, Rev. St. art. 4564, touching the sale of cattle by sale and delivery of marks and brands, and providing that to acquire title the purchaser shall have the bill of sale recorded, did not require the record of the bill of sale in order to pass title, although it recited marks and brands.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 346-348; Dec. Dig. ⬤⟞148.]

Appeal from District Court, Newton County; A. E. Davis, Judge.

Action by B. Z. Powell, as temporary administrator of the estate of J. W. Erwin, deceased, against George W. Stephenson, in which B. Z. Powell, individually, and others later filed interventions as creditors of the estate, and upon his appointment' as permanent administrator, W. C. Erwin having declined to prosecute the suit, the case proceeded to trial with the interveners prosecuting the suit for the benefit of the estate and for themselves. Judgment for defendant, and plaintiff appeals. Affirmed.

Wightmon & Hancock, of Newton, and Powell & Huffman, of Jasper, for appellant. Forse & Hamilton, of Newton, and Roi Blake, of Jasper, for appellee.

BROOKE, J. This is an action brought by B. Z. Powell, as temporary administrator of the estate of J. W. Erwin, deceased,

against George M. Stephenson, for the possession of 142 head of stock cattle alleged to be the property of J. W. Erwin, deceased, and alleged to be of the reasonable value of $2,500. In this cause B. Z. Powell individually subsequently filed an intervention as a creditor of the estate of J. W. Erwin, deceased; also the Galveston Dry Goods Company intervened as a creditor of the estate of J. W. Erwin, deceased. Interveners, after alleging their indebtedness against the estate, alleged the ownership and possession of the property sued for to have been in J. W. Erwin, deceased, until the date of his death, and pleaded the statute of two years' limitation, and also pleaded in the alternative that, if the defendant, George M. Stephenson, claimed the property under conveyance to him by the said J. W. Erwin, deceased, prior to and before his death, such sale or pretended sale was fraudulent, and that the property remained in the possession of the deceased, J. W. Erwin, until the time of his death, and never was in the possession of the defendant George M. Stephenson, prior to the death of said Erwin, and interveners further alleged the insolvency of J. W. Erwin, deceased, at the time of said sale. Interveners further alleged that they were not informed as to whether W. C. Erwin, administrator of the estate of J. W. Erwin, deceased (who had been appointed permanent administrator of the estate of J. W. Erwin, deceased, after the filing of this suit), would prosecute the suit as originally filed by the temporary administrator, and prayed the court that in the event said administrator, W. C. Erwin, failed to do so, that interveners be permitted to prosecute the action for the benefit of the estate of J. W. Erwin, deceased.

Defendant answered, excepting to the original petition filed by the temporary administrator, and to the interventions filed by interveners, the gist of his answer being that the defendant had purchased the cattle sued for from J. W. Erwin, deceased, prior or to the death of said J. W. Erwin, upon a range delivery, and that interveners had no rights in the cause, because interveners' claim had been refused by the administrator, and they had not been established against the estate by suit. The permanent administrator, W. C. Erwin, who was the duly appointed administrator of the estate of J. W. Erwin, deceased, appointed after the filing of this cause by the temporary administrator, admitted ownership in the defendant, George M. Stephenson, of the cattle sued for, and for other reasons refused to prosecute the suit, to which plea interveners filed an answer specifically denying the allegations thereof. The case proceeded to trial, with the interveners prosecuting the suit for the benefit of the estate of J. W. Erwin, deceased, and for themselves, on their alternate pleas. The case was submitted to

the jury on special issues as follows, and the jury found as follows:

Question No. 1: "Was the sale of the cattle the subject-matter of this suit by J. W. Erwin to George M. Stephenson on the 2d day of July, 1911, made by J. W. Erwin for the purpose of defrauding his creditors? You will answer this question 'Yes' or 'No,' as you may determine the fact to be."

To which the jury answered "No."

Question No. 2: "Did George M. Stephenson, at the time he purchased the cattle, if he did purchase the cattle, from J. W. Erwin, and received the bill of sale therefor, if he did receive a bill of sale therefor, know that it was the intention of J. W. Erwin to sell said cattle to him for the purpose of defrauding his creditors? You will answer this question 'Yes' or 'No,' as you may determine the fact to be."

To which the jury answered "No."

Question No. 3: "At the time of the sale of cattle by J. W. Erwin to George M. Stephenson, was it the intention of J. W. Erwin and George M. Stephenson to enter into a pretended sale of said cattle for the purpose of placing the cattle beyond the reach of creditors of J. W. Erwin? You will answer this question 'Yes' or 'No' as you may determine the fact to be."

To which the jury answered "No."

Question No. 4: "Was the sale of cattle by J. W. Erwin to George M. Stephenson made in good faith on the part of George M. Stephenson, and did George M. Stephenson pay to J. W. Erwin a valuable consideration for the cattle? You will answer this question 'Yes' or 'No,' as you may determine the fact to be."

To which the jury answered "Yes."

Question No. 5: "At the time of the sale of the cattle by J. W. Erwin to George M. Stephenson, did J. W. Erwin make a range delivery of said cattle to George M. Stephenson, and did George M. Stephenson understand that J. W. Erwin was making a delivery of the cattle on the range to George M. Stephenson, and did George M. Stephenson receive from J. W. Erwin said cattle on the range? You will answer this question 'Yes' or 'No,' as you may determine the fact to be."

To which the jury answered "Yes."

Question No. 6: "What was the market value of the cattle in controversy in the spring of the year 1914, when taken into possession by George M. Stephenson, defendant herein? Answer this question by stating the amount in figures and placing the dollar mark in front of the figures."

To which the jury answered, "$16.50 per head."

On the answers of the jury above the court rendered judgment for the defendant, George M. Stephenson, for the title and possession of the cattle sued for.

The verdict is assailed in the first assignment for the reason that appellant claims the answers by the jury to the first four questions submitted to them by the court are not supported by the evidence introduced on the trial of this cause.

[1] At the outset it may be well to say the answer of the permanent administrator, W. C. Erwin, setting forth that he, as such administrator, is without power or authority under the law to prosecute this suit, or to inventory the said cattle as the property of said estate, for the reason that, inasmuch as the said Stephenson is claiming said cattle as his own, under the alleged purchase by him from the said J. W. Erwin during his lifetime, the title and possession of said cat-

tle thereby passed from the said decedent to the said Stephenson, and that, inasmuch as the said J. W. Erwin could not have recovered from the said Stephenson said cattle during the lifetime of the former, his estate could not recover them from the said Stephenson after the death of the said J. W. Erwin, and this is true whether the alleged sale and transfer of the cattle was done bona fide or otherwise, embodies a correct proposition of law, and, so far as said administrator is concerned, should have been dismissed with his costs.

This identical question was passed on in Willis & Bro. v. Smith, 65 Tex. 658. Chief Justice Willie, speaking for the court says:

"There can be no doubt but that the administrator was the proper party to sue for such property as descended to the heirs upon the death of Laird. This property came to them charged with Laird's debts, and the administrator was entitled to its possession and management, for the purpose of paying, as far as possible, all claims against the estate. Pending an administration, no one creditor, nor any combination of creditors, has any right to such property, or can bring suit for its recovery. They must have it subjected to their debts through the county court, and the proper officer of that court, viz. the administrator, must bring such suits as are necessary to reduce it to possession, and bring it within the jurisdiction and control of that tribunal. But the case is different when property has been conveyed by a decedent in fraud of his creditors. Such property forms no part of his estate, and *hence the administrator has no concern with it whatever.* [Italics ours.] All the title of the grantor passed to his fraudulent grantee, subject only to the right of the defrauded creditor to have the conveyance set aside, so far as his debt is concerned, and the property made liable for its payment.

"As to subsequent creditors, the title of the grantee is good, and the fraudulent grantor has no right in it whatever. He has no title which can descend to his heirs, or vest in his executor or administrator for the payment of debts. As none but prior creditors have any claim against the property, and the estate has no title to it, these creditors are the only parties who can sue to subject it to their debts, and an administrator would not be a proper plaintiff in such a proceeding. From these views it follows that the appellants, having a judgment against the estate of Laird, his estate being insolvent, were entitled to subject property conveyed in fraud of their debt to the payment of their judgment. The administrator of Laird was not authorized to sue for the property, for the purpose of administering it, as it could under no circumstances form part of the estate. Forming no part of the estate to be administered, the county court could have no jurisdiction or control over it, and hence the court should not have sustained the plea in abatement. The plaintiffs should have been allowed to proceed with their action, so far as it sought to subject any property conveyed by Laird, in fraud of the plaintiffs' claim, to the payment of the judgment; and the suit could be dismissed only so far as it claimed to have any property which descended to the heirs made liable to the plaintiffs' demand."

[2] It may be well also to state in this connection, that the claim of B. Z. Powell against J. W. Erwin had been presented to the administrator and was rejected by him, and subsequently, upon suit to establish the same, it was decided by the district court

of Jasper county, before whom said suit was brought, that the consideration had failed, and that therefore the said B. Z. Powell was not a creditor of the estate; and, said cause having been appealed to this court, being numbered 133 on the docket thereof, it was decided during the present term of this court in favor of the estate, which action is binding, so far as B. Z. Powell's interest is concerned in the present controversy, and eliminates him from the same.

[3] The Galveston Dry Goods Company, so far as this record shows, presented its claim to the permanent administrator, and the same was rejected, and we are unable to find where the same has been established by a judgment of any court. However, we will proceed to consider the appellants' assignments of error.

It is earnestly contended and strenuously urged that the bill of sale given by J. W. Erwin, deceased, to the appellee in this case, which reads as follows:

"Know all men by these presents that I, J. W. Erwin, of the county of Jasper and state of Texas, have hereby granted, sold, and conveyed all of my cattle to George M. Stephenson, same being three hundred, more or less, at range delivery, cattle being marked split and under bit in one ear and under square in the other, for a consideration of $10.50 per head.

"Signed and dated this 2d day of July, 1911.

"J. W. X̅ Erwin.
 his
 mark

"Witness:
 "Webb Smith.
 "Leo Blake"

—has never been recorded, and, as above stated, the contention is that the statute requires the record of bills of sale in such cases as the above. We must not forget that there is testimony in the record showing that after the bill of sale was made there was an actual delivery of the cattle on the range to Stephenson. Therefore, if the parties went upon the range, and Stephenson took possession of the cattle, the contention of appellant would be of no avail. On this phase of the matter Jack Bishop testified:

"I am acquainted with George M. Stephenson, and I was raised in two miles of J. W. Erwin. I have lived about two miles or two and a half miles from Mr. Erwin's place. I have known him ever since I was old enough to remember. I was acquainted with Mr. Erwin's cattle. I helped Mr. Stephenson gather and look after those cattle. I helped Mr. Stephenson mark and helped to gather when he carried them off. Mr. Stephenson paid me for that work. Neal Hayes and Pole Erwin helped me in the work. Mr. George sent back money by me once to Neal. I had a conversation with J. W. Erwin relative to this title. I don't know how long ago he told me he didn't own but two in the world. He said he didn't own but two head. He said the old woman there claimed them two. He said Mr. George Stephenson had sold them all to him but two, and he said the old woman claimed them. Mr. Stephenson came up there at various times for the last four or five years to look after these cattle. We were at Mr. Erwin's house when he told me about the two cows and the old woman claiming them. He told me that three or four years ago. It was in 1912 or 1913,

somewhere along there. I wasn't paying much attention to it; two or three years ago, somewhere along there. He told me something about his debt at that time. He said B. Z. Powell had cleaned him up. He said he had to sell his cattle to pay his debts. He didn't say anything about the Galveston debt. He didn't tell me what he got for them. I never asked him. Julius Erwin and I were raised together, and never had any trouble. I have known him all my life, raised in the same settlement with me. I didn't ask him what he received for the cattle. I was never no hand to question anything. I don't remember how many he said he sold. He said he sold all but two. I have helped Mr. Stephenson for the last four or five years with his cattle. We marked the calves. I don't know how many we marked in 1911. I don't know how many we marked in 1912. We marked them with Mr. Erwin's mark. Mr. Stephenson was with me when we marked them, also Neal Hayes and Pole Erwin. I don't know who else; maybe Dow Reese has helped some time or other; seems like maybe Hal Hayes might have been along. I know Neal Hayes was there, and Pole Erwin, I know that. We were from Wharton Switch to Jules when we marked them, wherever we could catch them. We marked them every spring, some time we would be a week. George was with me every time when I went in the woods. He carried them all away from there last year, 1914. He carried them off last summer. I don't know how many we marked last spring before Mr. Erwin died. I helped Mr. Stephenson. Julius never did hire me to help him. George never did brand any cattle. I helped him mark. I helped him drive them off after Jule died. I don't know how many they drove off. There was something over 100 head. I never counted them. He brought other cattle from Robertson's down to Jasper, in that country. I believe we made two round-ups last year. I don't know how many we drove off the last time. I didn't have a book and pencil. He bought part of them from me. I don't know how many we rounded up then. I never did count them. I don't know of his buying any cattle from Julius. He would drive cattle from there before Julius died. I mean during that year. He drove every year for the last four or five years. Last year he got all he could find. He had been there every year for the last five years. I know that, and he got cattle, and I have helped him. He bought some cattle from other people. I don't know whether he bought any from Jules or not. He claims them to be his. He didn't buy any from Jule. They were his. I knew it. In 1914 he cleaned up the Erwin bunch, just about all we could find. He bought some cattle in 1913 from Son Boy Robinson. He bought cattle from most everybody in that country. These were his own, I know he had them. He had authorized me to sell them and I had not done it. He authorized me to sell some cattle over there in the Erwin bunch. I never did sell any. I never had time to fool with them. I helped him when he hired me, and he always paid me. He got cattle there for the last five or six years."

Being asked if he ever knew of his buying cattle from Julius Erwin in 1911, he answered:

"I don't know what he done. They had me on the horse all the time, and I couldn't tell what they was doing. Julius was there, and sometimes he would help, and sometimes he wouldn't."

Being asked when he got those cattle up there and carried them out, whether he knew that he bought them from Julius or not, he answered:

"He was messing with them. He had bought them some time along—I don't know what year exactly. He said so, and others said so; two or

three years back. I don't know anything about him getting 30 head from Jule. I didn't know how many he got. I did not question him. I was hired to work, and wasn't hired to tend to their business. I was helping them gather in 1914, when he came up there and made the last two gatherings. He got them on Sandy creek and from Mellin's creek, and Beef creek. They were in the range where they had been raised, promiscuous range of Julius Erwin's cattle. When I helped George round up the cattle sometimes we penned them at Dow Reese's. Most of the time at Julius' house. We penned Mr. George's cattle. They said they were his. He was paying me for the work. The cattle he was buying up there he carried them off down where he lived. They carried the Erwin cattle along with the others, all bunched together. He had bought a few from me ever since he has ever bought up there. I helped him pen them when they were carrying them off. I have helped mark ever since he has been coming up there. I don't know; I didn't set it down. When I am working for a man, I ain't a tending to his business. I haven't helped Jule round up and mark any cattle. I don't know of him doing it for the last few years. It has been six or seven years ago since I heard of Jule's marking any cattle; if he marked any I don't know of it. I am in the woods a right smart when there is anything in it. It is about 2½ miles from my place to where Julius lived. I don't know what Julius was doing about selling his cattle."

Hamp Mattox testified:

"I was acquainted with J. W. Erwin and George M. Stephenson. I have had occasion to go among the Erwin cattle. Mr. Stephenson employed me all I ever had anything to do with them. Mr. Erwin told me about who these cattle belonged to. He told me they belonged to George Stephenson. Mr. Stephenson took some cattle from the ranch up there prior to the time he gathered the whole bunch. He took them at different times. He would take beef cattle, mostly steers. I don't know exactly how many times I helped Mr. Stephenson drive cattle. About six years ago was my first helping. He came to my place and had dinner, and he was buying cattle, and I remarked to him that if he needed any help I would like to have a little job in the drive. I have helped him some ever since. He bought a few from nearly everybody. He drove the cattle off. I don't think he failed to get any from Julius' place every year. I don't know whether he paid for them or not. So far as I know, he may have paid him each and every year. It has been something like two years since Mr. Erwin told me that the cattle belonged to George Stephenson, something about a year before Erwin died. Erwin died last spring, and I think it was about a year before that he told me he had sold the cattle to George. I was at his place when he told me. He told me that as I was figuring on buying myself. He just remarked that he had sold all his cattle to George Stephenson. I know a negro by the name of Joe Wilson. He came to see me once to get me to help Erwin drive some cattle. I remember it was about the 10th of last April. I went and helped him drive some cattle. We drove them to Brookeland. My recollection was Mr. Lewis Letney and Julius Erwin, maybe a little negro boy, helped part of the way. I don't know who it was for. It was about 15 head. I was in the general gathering with Mr. Stephenson after Mr. Erwin's death. He was there with a good many of them were driven off. I remember being in this drive. I don't remember how many there were. Seems to me there were about 60. I never kept any account, with reference to bill of sale and of its record."

In the case of Swan et al. v. Larkin, Deceased, 8 Tex. Civ. App. 421, 28 S. W. 217,

in which a writ of error was denied by the Supreme Court, the court says:

"Article 4562 of the Revised Statutes provides that the sale of any animal of the species therein enumerated, accompanied with actual delivery, is prima facie illegal, unless also accompanied by a written bill of sale giving the number, marks, and brands of each sold and delivered. This statute is directory, and the presumption of illegality that attends the sale without the written evidence accompanying is one that can be rebutted and removed by proof of good faith. Wells v. Littlefield, 59 Tex. 561. Article 4564 applies to a different class of sales, and contemplates no delivery of the property itself, but merely a written transfer of marks and brands in the manner prescribed; and it is declared, in effect, that under a sale made in this manner no title shall be acquired, unless the statute is followed. As we understand these articles, there are only two methods, by voluntary transfers, in which title to property of the kind described can be acquired, the one by actual delivery, accompanied by a bill of sale, or other proof of good faith; the other contemplating no delivery of the animals, but the mere transfer of the marks and brands in the manner specified. Under article 4562 there could be a valid sale of a number of cattle described simply by marks and brands, or in any manner that would identify and segregate them from other stock, when accompanied by delivery. Bank v. Brown, 85 Tex. 85, 23 S. W. 862. We are of the opinion that this delivery might be accomplished by designating them as all the cattle in certain brands in certain pastures, provided the latter were not of such proportions, when considered with the number of cattle, and other circumstances, as to amount, in effect, to having the cattle at large upon the range. If the cattle in controversy were loose on the range, there was no delivery, under the facts of this case; and, a bill of sale being an absolute prerequisite to the acquisition of title, it follows that the sale would be absolutely null and void. The question of whether the stock were 'loose' on the range, as that word is used in the statute, involving, as it did, the question of delivery, was the turning point in this case. Without delivery of the property by Dubois & Wentworth to appellants, there could have been no valid sale, under article 4562; and if the cattle were on the range, there being no compliance with the statute as expressed in article 4564, there could have been no valid sale under its provisions. It cannot be said, as a matter of law, that 3,000 cattle turned loose in a 60,000-acre pasture are running in the range, as contemplated in article 4564."

"There is no law, statutory or otherwise, defining what 'running on the range' means; and, indeed, it would be impracticable to define the term, but it is purely a question of fact to be determined by the jury."

Further, the court says:

"We can readily imagine cases where the animals could not 'be herded, and penned without great inconvenience and expense,' in which there could be such actual delivery as to meet the requirements of article 4562. In other words, 'running at large in a range,' as qualified and explained in article 2293, is not necessarily the same as running on the range as contemplated in article 4564."

In the case of Nance v. Barber, 7 Tex. Civ. App. 111, 26 S. W. 151, the court, speaking through Justice Key, says:

"The district court held that the sale from T. N. Nance to the plaintiff was within the purview of article 4564 of the Revised Statutes, and that, as the bill of sale was not recorded, the sale was void, and conferred no title, and the jury were directed to return a verdict for the defendants. The article referred to reads as fol-

lows: 'Persons may dispose of stock animals of the kind mentioned in article 4562, as they run in the range, by the sale and delivery of the brands and marks; but in every such sale the purchaser, in order to acquire title thereto, shall have his conveyance or bill of sale of such stock recorded in the county clerk's office, in a book to be kept by him for that purpose, and such sale or transfer shall be noted on the record of original marks and brands in the name of the vendee or purchaser.' In sales covered by this statute it cannot be doubted that, in order for the purchaser to acquire title to the property, he must take a written conveyance, and have the same duly recorded. But, in our opinion, the statute does not apply to the sale from T. N. Nance to the plaintiff. By its terms it is limited to the transfer of live stock as they run in the range, *by the sale and delivery of the brands and marks.* [Italics ours.] This statute was first enacted in 1866. At that time, and even when the Revised Statutes were adopted, a considerable portion of the state was devoted almost exclusively to stock raising. Individuals owned large numbers of live stock that were not kept in any inclosure, but ran at large upon the common, and were identified exclusively by the owner's mark and brand. It was a common practice then, and in some parts of the state may be at this time, for an owner of a stock of horses or cattle to sell his entire stock; that is to say, all the animals that he owned, running on the range, in a particular mark and brand. Such transactions were commonly known as and designated a 'sale of a mark and brand.' It is to these sales that the statute in question refers; and, as it places restrictions upon the right of an owner to sell his property, one of the most valuable rights incident to ownership, we do not feel at liberty to extend its meaning to transactions that are not embraced within its terms. In the present case T. N. Nance owned a stock of cattle in Llano county. Part of this stock—in fact, the greater part—he removed to Hays county, and placed in a pasture. These he sold to the plaintiff, designating them as 116 head, bearing certain brands and various marks. *This was not a transfer by sale of brands and marks.* [Italics ours.] The bills of sale do not purport to convey all the cattle owned by T. N. Nance in designated brands, but do convey a specified number of such cattle. The concluding clause of article 4564, which requires the 'sale or transfer to be noted on the record of marks and brands in the name of the vendee or purchaser,' supports our construction of said article. A person can have but one brand and mark, which is required to be recorded; and it was intended by the clause above quoted that the record of brands and marks should at all times show to whom a brand and mark once recorded belonged."

The testimony in this case shows there was no intention to sell or transfer his mark or brand by J. W. Erwin to George M. Stephenson.

We have carefully examined all the assignments of error of the appellant, and, finding no merit in the same, the action of the lower court in entering judgment for George M. Stephenson is in all things affirmed.

It is so ordered.

---

&mdash;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes